UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| JASON COKE PRATER, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:03-cv-673 |
| | ) | |
| v. | ) | Honorable Richard Alan Enslen |
| | ) | |
| PAUL RENICO, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. After a jury trial, Petitioner was convicted of three counts of first-degree criminal sexual conduct (CSC), MICH. COMP. LAWS § 750.520b, and one count of first-degree home invasion, MICH. COMP. LAWS § 750.110a(2), in the Grand Traverse County Circuit Court. On January 5, 2001, the Grand Traverse County Circuit Court sentenced Petitioner as a second habitual offender to concurrent prison terms of eighteen to sixty years for each of the three first-degree CSC convictions, and a consecutive prison term of twelve to thirty years for the first-degree home invasion conviction.

In his *pro se* petition, Petitioner raises the following grounds for habeas relief:

I.     Petitioner was denied the effective assistance of counsel whereas:

    A.     In opening statements, counsel informed the jury that Petitioner had a prior felony conviction when Petitioner did not testify.

    B.     Counsel failed to comply with discovery rules so counsel could not impeach testimony from a prosecution witness or call Petitioner's stepfather as a defense witness.

    C.      Counsel called Petitioner's mother to testify when she had a prior felony conviction for writing bad checks.

    D.      Counsel failed to object to instances of prosecutorial misconduct as set forth below.

II.    The prosecutor violated Petitioner's state and federal constitutional due process rights to a fair trial by engaging in misconduct during his closing argument whereas:

    A.      The prosecutor commented on Petitioner's stepfather's failure to testify.

    B.      The prosecutor disparaged defense counsel.

    C.      The prosecutor appealed to the jury to sympathize with the victim by suggesting that it was worse to be raped rather than murdered and to tell the victim that they believed her rather than Petitioner.

Respondent has filed an answer to the petition (docket #15) stating that Petitioner's grounds for habeas relief should be denied. Upon review and applying the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 (AEDPA) standards, I find that Petitioner's grounds for habeas relief are without merit. Accordingly, I recommend that the petition be denied.

## **Procedural History**

### **A.    Trial Court Proceedings**

The state prosecution arose from Petitioner's alleged rape of Ruth Johnson and home invasion of Ms. Johnson's house in Buckley, Michigan, in the early morning hours of July 8, 2000. Petitioner was charged with three counts of first-degree CSC and one count of first-degree home invasion. On December 5 and 6, 2000, the Grand Traverse County Circuit Court tried Petitioner before a jury.

Ms. Johnson testified that she awoke when her alarm went off at 2:30 a.m. on July 8, 2000.  (Trial Tr. vol. I, 172, Dec. 5, 2000.)  She was late for work at the Meijer bakery.  (Tr. I, 171-72.)  Upon walking into the living room, Ms. Johnson noticed that the answering machine light was blinking on her phone.  (Tr. I, 173.)  She listened to the message, which was from the teenage daughter of her neighbor, Mike Leatherman.  (Tr. I, 173.)  Shortly thereafter, she noticed headlights in her driveway. (Tr. I, 173.)  Ms. Johnson opened her front door.  (Tr. I, 197-98.)  A young man, who she did not know, exited a van and requested that she accompany him to Mr. Leatherman's house.  (Tr. I, 173.)  Ms. Johnson told him to return to Mr. Leatherman's house and inform Mr. Leatherman that there was a message from his daughter on her answering machine. (Tr. I, 216).  She then closed the front door.  (Tr. I, 173.)  Ms. Johnson watched the van travel in the direction of Mr. Leatherman's house.  (Tr. I, 173-74.)

Approximately fifteen minutes later, Ms. Johnson heard a knock at her door.  (Tr. I, 174.)  Ms. Johnson opened the door because she thought it might be Mr. Leatherman inquiring about his daughter.  (Tr. I, 174.)  She found Petitioner standing outside her front door.  (Tr. I, 174.)  Petitioner once again urged her to go to Mr. Leatherman's house.  (Tr. I, 175.)  Ms. Johnson replied that she would drive her own car to Mr. Leatherman's house.  (Tr. I, 175.)  When she attempted to close the front door, Petitioner pushed the door open, which forced Ms. Johnson to back up a few steps. (Tr. I, 175.)

Upon entering Ms. Johnson's house, Petitioner asked to use her telephone to call Mr. Leatherman.  (Tr. I, 176.)  Ms. Johnson noticed that Petitioner smelled of liquor and marijuana.  (Tr. I, 178.)  At this time, she told one of her two dogs to sit and stay.  (Tr. I,  178.)  Ms. Johnson then handed Petitioner a cordless phone to call Mr. Leatherman and went to the bathroom for a

hairbrush. (Tr. I, 177-79). When she turned to leave the bathroom, Ms. Johnson ran into Petitioner standing at the door. (Tr. I, 179.) Petitioner told her that he wanted to make love to her. (Tr. I, 179.) Ms. Johnson defiantly replied that there was no way that he was going to touch her. (Tr. I, 179.) She pushed Petitioner, hit him and screamed for her dogs, but Petitioner pushed her inside the bathroom and shut the door. (Tr. I, 179.) Petitioner then ripped off Ms. Johnson's shirt and attempted to remove the rest of her clothes. (Tr. I, 180.) Ms. Johnson tripped and fell during the struggle. (Tr. I, 180.)

Ms. Johnson continued to fight but Petitioner eventually removed her pants and undergarments. (Tr. I, 184-85.) She even managed to stand up but tripped and fell again so that she was on her hands and knees. (Tr. I, 184-85.) While using the tub as leverage to stand up, Petitioner grabbed her from behind, and pushed her face into the carpet. (Tr. I, 186.) He inserted one of his fingers in her rectum and another finger in her vagina. (Tr. I, 186.) Ms. Johnson urged Petitioner to stop to no avail. (Tr. I, 186.) Petitioner then penetrated her vagina with his penis. (Tr. I, 186.) He told Ms. Johnson that it would not hurt if she would stop fighting him. (Tr. I, 186.)

While Ms. Johnson was on her hands and knees, she noticed her telephone lying by the toilet. (Tr. I, 187.) Ms. Johnson reached for the phone and dialed 911. (Tr. I, 187.) When Petitioner heard the phone ring, he picked up the phone and threw it. (Tr. I, 187.) Petitioner then turned Ms. Johnson on her back. (Tr. I, 188.) He spread her legs and penetrated her vagina again with his penis. (Tr. I, 188.) Petitioner repeatedly told Ms. Johnson that he loved her and wanted her. (Tr. I, 188.) He also tried to kiss her on several occasions. (Tr. I, 188.) At this time, Ms. Johnson noticed that one of her dogs, who had been scratching at the bathroom door (Tr. I, 179), was heading for the front of the mobile home (Tr. I, 189). She then heard Mr. Leatherman yell for her. (Tr. I,

190.) Ms. Johnson, however, could not scream because Petitioner covered her mouth with his hand. (Tr. I, 189-90.) When Mr. Leatherman yelled a second time, Ms. Johnson jerked her head away from Petitioner's hand and screamed "Mike, call the police!" (Tr. I, 191.) Ms. Johnson did not hear anyone else call for her besides Mr. Leatherman. (Tr. I, 221.) Mr. Leatherman came to the bathroom door, pushed on the door, and yelled "Jason, what the heck are you doing?" (Tr. I, 191.) Petitioner stood up, left the bathroom and ran down the hallway. (Tr. I, 191.)

Mr. Leatherman drove Ms. Johnson to the hospital where she was examined by a nurse. (Tr. I, 191-92.) Ms. Johnson sustained injuries on her arm and back from the attack and did not return to work for six weeks. (Tr. I, 192-93.) She also suffered from reoccurring urinary tract infections and nightmares. (Tr. I, 192-93.)

Mr. Leatherman testified that he has known Ms. Johnson for approximately fifteen years. (Tr. I, 238.) Mr. Leatherman met Petitioner through work in the spring of 2000. (Tr. I, 239.) On July 8, 2000, Mr. Leatherman ran into Petitioner at the Salines Bar in Buckley and noticed that Petitioner had been drinking. (Tr. I, 239.) At approximately 1:00 a.m., Petitioner arrived at Mr. Leatherman's home intoxicated. (Tr. I, 240.) Sometime later, Petitioner asked Mr. Leatherman where Ms. Johnson lived, but Mr. Leatherman refused to give him that information. (Tr. I, 241.) Mr. Leatherman told Petitioner that he could meet Ms. Johnson when he was sober. (Tr. I, 241.)

When Mr. Leatherman determined that it was time for Petitioner to leave, he asked his son-in-law to call Petitioner's stepfather, Clifford Spalding, to pick him up since Petitioner was too intoxicated to drive. (Tr. I, 241-43.) Petitioner, however, disappeared. (Tr. I, 242.) Approximately forty minutes later, Mr. Spalding arrived at Mr. Leatherman's house, and requested that Mr. Leatherman go to Ms. Johnson's house. (Tr. I, 242-43.) Mr. Leatherman thought it was odd

that Mr. Spalding asked him to go to Ms. Johnson's house because it was apparent that he had been to the "scene" first.  (Tr. I, 243.)

When Mr. Leatherman arrived at Ms. Johnson's house, he noticed Petitioner's mother, Cynthia Spalding's, van in the yard as well as Mr. Spalding's truck.  (Tr. I, 243.)  Petitioner had been driving Ms. Spalding's van earlier that evening.  (Tr. I, 243.)  Mr. Leatherman entered Ms. Johnson's house twice and yelled for her.  (Tr. I, 244-45.)  The first time he did not receive a response.  (Tr. I, 244.)  After heading back outside, Mr. Leatherman asked Mr. Spalding what he should do.  (Tr. I, 244.)  Mr. Spalding told him to go back in the house and "find out."  (Tr. I, 244.)  The second time he entered the house he heard Ms. Johnson say "get him off me."  (Tr. I, 244.)  Mr. Leatherman then looked in the bathroom.  (Tr. I, 257.)  He noticed that Ms. Johnson was on her back crying, against the bathtub, and Petitioner was holding her knees.  (Tr. I, 246, 264.)  Both Petitioner's and Ms. Johnson's pants were down, and Petitioner's penis was out.  (Tr. I, 246, 248.)  When Mr. Leatherman started to enter the bathroom, Petitioner jumped up, pulled his pants up, pushed the bathroom door open and Mr. Leatherman out of the way, and ran out the front door.  (Tr. I, 245, 248, 257-58.)  On his way out, Petitioner said "she wanted it" to Mr. Leatherman.  (Tr. I, 245.)  A short time later, Mr. Leatherman drove a crying and shaking Ms. Johnson to the hospital.  (Tr. I, 247.)  They also called the police on the way to the hospital but could not get through due to poor cell phone reception.  (Tr. I, 247.)

During his testimony, Mr. Leatherman denied that he told Petitioner that Ms. Johnson liked to screw.  (Tr. I, 241, 248-49.)  He also stated that he did not send Petitioner to Ms. Johnson's house to have sex with her.  (Tr. I, 249.)

Grand Traverse County Deputy Police Officer Greg Stroh testified that he saw Mr. Leatherman pull into Munson Hospital with Ms. Johnson. (Tr. I, 164-65.) He noticed Mr. Leatherman's automobile because it had a broken taillight. (Tr. I, 164-65.) Ms. Johnson was shaking, crying and appeared to be in a state of shock. (Tr. I, 165.) Later that day, Officer Stroh entered Ms. Johnson's home and found a broken telephone in her bathroom. (Tr. I, 166-68.)

After receiving a report of possible criminal sexual conduct from Deputy Stroh, Sergeant Glen Harding of the Grand Traverse Sheriff's Department testified that he drove to Munson Hospital. (Tr. I, 280.) Although he did not have any contact with Ms. Johnson, he observed that she was crying. (Tr. I, 280-81.) Sergeant Harding traveled to Petitioner's home around 6:30 a.m. (Tr. I, 282.) In his interview, Petitioner explained that Mr. Leatherman told him that if he wanted a "good time" and a woman to screw, he should go down to Ms. Johnson's house. (Tr. I, 283.) As a result, Petitioner drove to Ms. Johnson's home. (Tr. I, 283.) He knocked on Ms. Johnson's door and she invited him in. (Tr. I, 283.) While in Ms. Johnson's house, Petitioner explained that he had a "sexual encounter and [Ms. Johnson] was the aggressor of the sexual act." (Tr. I, 283.)

Michigan State Trooper James McCloughen testified that he interviewed Petitioner at the request of Sergeant Harding. (Trial Tr. vol. II, 6, Dec. 6, 2000.) Trooper McCloughen found a few inconsistencies in Petitioner's statement with Sergeant Harding. (Tr. II, 7.) First, Petitioner stated "there was a time when [Ms. Johnson] had told him no, stop, and that he was in, . . ., in the midst of coming [sic] and he continued to have sex with her." (Tr. II, 7.) Second, Petitioner coaxed [Ms. Johnson] into giving him oral sex. (Tr. II, 7.) Although she told him "no," his penis entered her mouth by about an eighth of an inch. (Tr. II, 7.)

Cynthia Spalding, Petitioner's mother, testified that Petitioner was living at home in July 2000. (Tr. II, 38.) In response to a phone call early in the morning on July 8, Mr. and Ms. Spalding drove to Mr. Leatherman's house. (Tr. II, 38.)  After a brief encounter with Mr. Leatherman, Mr. and Ms. Spalding traveled to Ms. Johnson's house. (Tr. II, 38-9.) Mr. Leatherman gave them directions to Ms. Johnson's house. (Tr. II, 39.) Ms. Spalding noticed her van in Ms. Johnson's yard. (Tr. II, 39.) The doors were open, lights on, and engine was running. (Tr. II, 53.) Ms. Spalding stated that she knocked on Ms. Johnson's door, opened it a little and yelled but no one responded. (Tr. II, 40.) She also honked the car horn to no avail and yelled in the windows. (Tr. II, 40, 41.) She then requested her husband to bring Mr. Leatherman to the house. (Tr. II, 42.) When Mr. Spalding and Mr. Leatherman returned, Mr. Leatherman entered Ms. Johnson's home twice. (Tr. II, 42.) The first time, Mr. Leatherman stepped out of Ms. Johnson's house laughing. (Tr. II, 43, 49-50.) The second time, Mr. Leatherman also came out laughing but with Petitioner. (Tr. II, 50.) At that time, Petitioner and Ms. Spalding went home. (Tr. II, 50.) On cross examination, Ms. Spalding testified that she was convicted of a felony, writing a bad check, on March 5, 1993. (Tr. II, 55, 61.)

Laura Worthington testified that she works as a registered nurse and sexual assault nurse examiner in the emergency room at Munson Hospital. (Tr. I, 265-66.) She examined Ms. Johnson on July 8, 2000 and obtained DNA samples. (Tr. I, 269, 277.) Nurse Worthington found Ms. Johnson trembling, nervous and scared throughout the exam. (Tr. I, 269, 273.) Also, Nurse Worthington noted bruises on Ms. Johnson's knees and back, and tenderness in the vaginal area. (Tr. I, 270-72.) She requested that the doctor prescribe Xanax to calm Ms. Johnson. (Tr. I, 273-74.)

Dr. Sally Miller testified that she treated Ms. Johnson after the alleged assault because

she was complaining of neck and back pain. (Tr. II, 21.) She also treated her for a urinary track infection. (Tr. II, 21-22.)

After deliberating, the jury returned a verdict of guilty on all charges. (Tr. II, 140-41.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief raised the same issues as in his application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #22.) Petitioner filed a motion to remand that was denied by the Michigan Court of Appeals on March 18, 2002. (*See* 3/18/02 Mich. Ct. App. Order, docket #22.) By unpublished opinion issued on November 8, 2002, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentence. (*See* 11/8/02 Mich. Ct. App. Op. (MCOA Op.), docket #22.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same claims rejected by the Michigan Court of Appeals. By order entered May 30, 2003, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Order, docket #23.)

### <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act.. *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas

corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 317-18 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing

*Williams*, 529 U.S. at 405-07); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be 'unreasonable' "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

<u>**Discussion**</u>

## I.     Ineffective Assistance of Trial Counsel

In his first ground for habeas relief, Petitioner asserts that his trial counsel was ineffective in a litany of ways: (a) for informing the jury in opening statements that Petitioner had a prior felony conviction, when Petitioner failed to testify at trial; (b) for calling Petitioner's mother to testify when she had a prior felony conviction for writing bad checks; (c) for failing to comply with discovery rules so that (i) counsel could not impeach testimony from Mr. Leatherman, a prosecution witness, and (ii) counsel could not call Petitioner's stepfather as a defense witness; and

(d) for failing to object to several instances of prosecutorial misconduct as set forth in his second ground for habeas relief.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States,* 90 F.3d 130, 134-35 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.

A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the unreasonable application prong of § 2254(d)(1). Under the "unreasonable application" standard, the state court identifies the correct governing legal rule from

the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Wiggins v. Smith,* 539 U.S. 510, 520 (2003); *Williams,* 529 U.S. at 412-13; *Barnes v. Elo,* 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1164 (2004).

## A.   Opening Statements

In his first ground for habeas relief, Petitioner asserts that his trial counsel was ineffective for informing the jury in opening statements that Petitioner had a prior felony conviction. Petitioner later failed to testify at trial.   During *voire dire*, Petitioner's attorney twice stated to potential jurors that Petitioner would testify. (Tr. I, 22, 57.)   As a result, the prosecutor moved to allow impeachment testimony for Petitioner's 1997 conviction for credit card abuse. (Tr. I, 118-19, 136-42.) If Petitioner testified, the court stated that it would admitt the impeachment testimony. (Tr. I, 138-42.)   During his opening statements, defense counsel stated "[y]ou are going to be told that [Petitioner] was convicted in Texas of credit card abuse and because of that you can't believe his testimony.   Well, you know, people have problems from time to time.   That has nothing to do with what happened in July of [2000]." (Tr. I, 156.) On the second day of trial, however, defense counsel stated that Petitioner would not testify. (Tr. II, 32.)   Petitioner also expressly affirmed that he did not wish to testify before the court. (Tr. II, 33-34.)   In its instructions, the court informed the jury: "[e]very defendant has the absolute right not to testify.   When you decide the case you must not consider the fact that he did not testify and [it] must not affect your verdict in any way." (Tr. II, 112.)

The Michigan Court of Appeals addressed the issue as follows:

Defendant first argues that defense counsel was ineffective and that he was therefore deprived of his constitutional right to a fair trial.   According to defendant, defense counsel was ineffective for disclosing to the jury in opening argument the fact that defendant had a prior conviction in Texas for credit card abuse.   This Court

- 13 -

will not substitute its judgment for that of counsel regarding matters of trial strategy. *People v. Rice (On Remand),* 235 Mich App 429, 445; 597 NW2d 843 (1999). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v. Toma,* 462 Mich 281, 302; 613 NW2d 694 (2000).

Defense counsel's decision to disclose defendant's prior conviction to the jury could reasonably be considered sound trial strategy in light of the fact that the prosecutor moved before trial to be permitted to impeach defendant with evidence of the conviction. Moreover, defendant's subsequent decision not to testify was made under the advice of counsel, and such decisions are also matters of trial strategy. *Id.* at 304. The fact that defendant did not testify does not render defense counsel's disclosure improper. This Court will not assess counsel's competence with the benefit of hindsight. *People v. Rockey,* 237 Mich App 74, 76-77; 601 NW2d 887 (1999).

MCOA Op., pp. 1-2.

A strong presumption of correctness operates in favor of trial counsel's performance, therefore, the accused bears the burden of proving an ineffective assistance claim. *Strickland*, 466 U.S. at 687. With respect to the performance prong of the *Strickland* test, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. It is clear from the record that Petitioner intended to testify at the start of the trial. Counsel's reference to Petitioner's prior conviction during opening statements was a sound tactical decision, i.e. to reduce the shock the jury might have upon learning about such record at trial. Trial counsel's tactical decisions are particularly difficult to attack, *McQueen v. Scroggy,* 99 F.3d 1302, 1311 (6th Cir. 1996), and a petitioner's challenge to such decisions must overcome a presumption that the challenged action might be considered sound trial strategy. *Darden v. Wainwright,* 477 U.S. 168, 185-87 (1986). Petitioner failed to overcome the presumption that defense counsel's action was sound trial strategy. The court must not indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 690. At the time counsel disclosed Petitioner's

- 14 -

conviction, counsel believed that Petitioner would testify. Therefore, I find that Petitioner has failed the first prong of the *Strickland* test. *See id.*

When deciding ineffective assistance of counsel claims, "courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). Nevertheless, Petitioner also cannot satisfy the prejudice prong of the *Strickland* test in light of the overwhelming evidence of his guilt. As stated above, Petitioner must prove that there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different to show that Petitioner had been prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 694  Reasonable probability is defined as a probability "sufficient to undermine confidence in the outcome." *Id.*

Ms. Johnson testified that Petitioner pushed his way through her front door after she asked him to leave. (Tr. I, 175.)  Petitioner ultimately cornered her in the bathroom, and forcibly removed her pants and undergarments. (Tr. I, 179, 184-85.)  While struggling with Petitioner, Ms. Johnson tripped and fell so that she was on her hands and knees. (Tr. I, 184-85.)  Petitioner grabbed Ms. Johnson's from behind, and pushed her face into the carpet. (Tr. I, 185-86.)  He inserted one of his fingers in her rectum and another finger in her vagina. (Tr. I, 186.)  Although Ms. Johnson urged Petitioner to stop, Petitioner penetrated her vagina with his penis. (Tr. I, 186.)  Petitioner then turned Ms. Johnson on her back. (Tr. I, 188.)  He spread Ms. Johnson's legs and penetrated her vagina again with his penis. (Tr. I, 188.)  In his interview with Trooper McCloughen, Petitioner admitted that Ms. Johnson told him "no" and "stop" but he was in the midst of cuming so he continued to have sex with her. (Tr. II, 7.)

Mike Leatherman, who previously was acquainted with Petitioner, testified that he observed Ms. Johnson in the bathroom on her back crying, and pinned against the bathtub by Petitioner.  (Tr. I, 246, 264.)  Petitioner was holding her knees.  (Tr. I, 264.)  Both Petitioner's and Ms. Johnson's pants were down.  (Tr. I, 246, 248.)  Mr. Leatherman stated that Ms. Johnson did not appear to be a willing participant.  (Tr. I, 246.)  When Mr. Leatherman entered the bathroom, Petitioner jumped up, pushed the bathroom door open and Mr. Leatherman out of the way, and ran out the front door.  (Tr. I, 245, 248, 257-58.)  A short time later, Mr. Leatherman drove a crying and shaking Ms. Johnson to the hospital.  (Tr. I, 247.)  Laura Worthington, a registered nurse (Tr. I, 266), testified that she examined Ms. Johnson on July 8, 2000 (Tr. I, 269).  Nurse Worthington found Ms. Johnson trembling, nervous and scared throughout the exam  (Tr. I, 269, 273), and noted bruises on Ms. Johnson's knees and back, and tenderness in the vaginal area (Tr. I, 270-71).  Dr. Sally Miller also testified that she treated Ms. Johnson after the alleged assault because she was complaining of neck and back pain.  (Tr. II, 21.)  She further treated her for a urinary track infection.  (Tr. II, 22.)

Given this evidence, there is no reasonable probability that Petitioner would have been acquitted even if not for defense counsel's alleged error.  Accordingly, the Michigan Court of Appeal's decision did not result in an objectively unreasonable application of the standard established by Supreme Court law.

## B.    Calling Witness with Prior Felony Conviction

Petitioner asserts that his trial counsel was ineffective for calling Petitioner's mother, Cynthia Spalding, as a witness when she had a prior felony conviction for writing bad checks. During the  cross-examination of Ms. Spalding, the prosecutor asked her if she had a prior felony conviction.  (Tr. II, 55.)  Defense counsel objected, and out of the jury's presence, the court held that

the prior felony conviction was admissible under MICH. R. EVID. 609. (Tr. II, 55-60.) Ms. Spalding

was the only witness for the defense. The Michigan Court of Appeals stated:

> Defendant also asserts that defense counsel was ineffective for calling
> defendant's mother as a witness when she had a prior conviction for writing a bad
> check. It appears from the record that defense counsel actually represented
> defendant's mother in the action that resulted in her plea-based conviction. Whether
> defense counsel recalled representing defendant's mother is not entirely clear from
> the record. In any event, defense counsel's decision to call defendant's mother as a
> witness is presumed to be a matter of trial strategy and defendant has not overcome
> the presumption.

MCOA Op., p. 2.

Contrary to Petitioner's assertions, defense counsel engaged in effective assistance

of counsel by calling Ms. Spalding as a witness regardless of her felony conviction. Due to

discovery objections, explained below in Section I (C), defense counsel could not call Petitioner's

stepfather, Mr. Spalding, as a witness. Mr. and Ms. Spalding were the only witnesses to the alleged

crime besides Ms. Johnson, Mr. Leatherman, and Petitioner. Ms. Johnson and Mr. Leatherman were

both prosecution witnesses. As Petitioner did not testify, defense counsel could not call another

witness to support Petitioner's theory that he and Ms. Johnson engaged in consensual sex. As a

result, Petitioner failed to satisfy his burden that calling Ms. Spalding as a witness was "outside the

wide range of professionally competent assistance" for the performance prong of the Strickland test.

*Strickland,* 466 U.S. at 690. Where counsel's performance did not fall below an objective standard

of reasonableness, the court need not reach the question of prejudice. *See Smith v. Mitchell,* 348 F.3d

177, 199-200 (6th Cir. 2003). Even if the Court reached the question of prejudice, as stated above

in Section I (A), Petitioner could not establish prejudice given the overwhelming evidence that

Petitioner raped Ms. Johnson and committed the home invasion. *See Hicks v. Collins,* 384 F.3d 204,

215 (6th Cir. 2004) (finding that defendant was not denied the effective assistance of counsel due to the overwhelming evidence of defendant's guilt).

### C.       Failure to comply with Discovery Rules

Petitioner argues that his trial counsel was ineffective for failing to comply with the prosecutor's discovery requests in accordance with MICH. CT. R. 6.201.  While the prosecutor complied with defense counsel's discovery requests, defense counsel failed to respond to their request for a list of defense witnesses or to provide the prosecution with a notarized statement from Mr. Leatherman.  Upon the prosecution's objection to Mr. Spalding as a witness, defense counsel stated that he would not be calling Mr. Spalding as a witness.  (Tr. I, 122; Tr. II, 30-31.)  The court also refused to allow the notarized statement from Mr. Leatherman, which was obtained by defense counsel in his office.  (Tr. I, 259.)

The Michigan Court of Appeals addressed the arguments as follows:

Defendant next argues that defense counsel was ineffective in failing to comply with the prosecutor's discovery request.  According to defendant, as a result of defense counsel's noncompliance with the discovery request, defendant was unable to call his stepfather as a witness and was unable to thoroughly cross-examine another witness.  The trial court never specifically ruled on whether defendant's stepfather could testify because defendant agreed not to call his stepfather as a witness.  Even if defense counsel agreed not to call the witness in part because of his failure to comply with the discovery request, a decision to call a witness is a matter of trial strategy.  Moreover, counsel's failure to call a witness can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense.  *People v Hoyt,* 185 Mich App 531, 537-538; 462 NW2d 793 (1990).  Defendant's defense was that the victim consented.  Defendant argues in his appellate brief that his stepfather's testimony would have corroborated the defense theory of the case.  However, because no *Ginther* hearing was held, our review is limited to the existing record.  *People v Sabin (On Second Remand),* 242 Mich App 656, 659; 620 NW2d 19 (2000).  Therefore, we cannot say that defendant has overcome the presumption of effective counsel where it was unknown what testimony would actually have been presented.  Moreover, even had defendant's stepfather testified as asserted by defendant, it would merely have mimicked defendant's mother's testimony, which the jury either rejected or deemed insignificant in light of the

verdict, and which did not involve personal observation of the crime and contradicted other evidence based on personal observation. In other words, defendant suffered no prejudice.

Defendant also asserts that defense counsel's failure to comply with the prosecutor's discovery request deprived him of the opportunity to impeach a crucial prosecution witness. Decisions regarding the cross-examination of witnesses are a matter of trial strategy. *In re Ayres,* 239 Mich App 8, 23; 608 NW2d 132 (1999). Moreover, a defendant who asserts that he was denied the effective assistance of counsel must demonstrate that there was a mistake that caused him prejudice. *People v. Crawford,* 232 Mich App 608, 615; 591 NW2d 669 (1998). To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Toma, supra* at 302-303. Defendant has not alleged how defense counsel's inability to impeach the witness caused him prejudice or that the result of the proceedings would have been different if he had been permitted to impeach the witness' testimony. Therefore, defense counsel's actions did not constitute ineffective assistance of counsel and did not deprive defendant of a fair trial.

MCOA Op., pp. 2-3 (footnote omitted).

While defense counsel's failure to respond to the prosecutor's discovery request violated MICH. CT. R. 6.201, Petitioner was not prejudiced by the error. As the court of appeals noted, Petitioner failed to allege what testimony would have been presented by Petitioner's stepfather. Further, Mr. Spalding's testimony would have been cumulative of the testimony given by Ms. Spalding. Petitioner also neglected to demonstrate what testimony would have been elicited during defense counsel's cross-examination of Mr. Leatherman. Petitioner does not identify how any of trial counsel's alleged inadequacies prejudiced his trial, thus failing the second prong of the *Strickland* test. *See Strickland,* 466 U.S. at 689. Further, as stated above in Section I (A), the evidence of Petitioner's guilt is overwhelming. Accordingly, I find that Petitioner was not prejudiced by counsel's performance at trial.

- 19 -

### D.    Failure to object to Prosecutorial Misconduct

Finally, Petitioner argues ineffective assistance of trial counsel for counsel's failure to object to several instances of prosecutorial misconduct outlined in Section II.  In this case, the Michigan Court of Appeals concluded that Petitioner was not deprived of the effective assistance of trial counsel, stating:

> Defendant finally contends that defense counsel was ineffective for failing to object to the alleged prosecutorial misconduct.  This argument is without merit because the prosecutor's remarks were not improper, and defense counsel is not obligated to make meritless or futile objections.  *People v. Milstead,* 250 Mich App 391, 401; 648 NW2d 648 (2002); *People v. Kulpinski,* 243 Mich App 8, 27; 620 NW2d 537 (2000).

MCOA Op., p. 3.

Because I find that Petitioner's prosecutorial misconduct claims in Section II are without merit, Petitioner cannot establish that trial counsel was deficient and/or that he was prejudiced by counsel's conduct.

### II.    Prosecutorial Misconduct during Closing Arguments

In his second ground for habeas relief, Petitioner asserts that he was denied due process and a fair trial from prosecutorial misconduct during closing arguments and rebuttal closing arguments.  Petitioner alleges that the prosecutor committed error by:  (a) commenting on Petitioner's stepfather's failure to testify; (b) disparaging defense counsel; and (c) appealing to the jury's sympathy for the victim.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v.*

*Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir. 2003), *cert. denied*, 541 U.S. 1095 (2004). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Based on Supreme Court precedent, the Sixth Circuit has adopted a two-step approach for determining whether prosecutorial misconduct violates a defendant's due process rights. *See United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001); *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (utilizing this test to evaluate a due process claim based upon prosecutorial misconduct raised in a post-AEDPA habeas petition). The Court first must consider whether the prosecutor's conduct and remarks were improper. *Carter*, 236 F.3d at 783. If the Court finds that the remarks were improper, it must determine if the impropriety was flagrant under *United States v. Leon*, 534 F.2d 667 (6th Cir. 1976). *See United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994). To determine flagrancy, the court should consider the four-factor test set forth in *Carroll*, 26 F.3d at 1385. The four factors are as follows: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. *Id.* (quoting *Leon*, 534 F.2d at 678-83).

　　　　　If the remarks are flagrant, a new trial should be ordered, per *Leon*. *Id.* at 1384, 1389-90. If the comment is determined not to be flagrant, the court will reverse only "when (1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the district court failed to give a curative instruction." *United States v. Brown,* 66 F.3d 124, 127 (6th Cir. 1995) (citing *Carroll,* 26 F.3d at 1384-90). *See also Darden,* 477 U.S. at 181-82; *Donnelly,* 416

U.S. at 643. "In assessing whether the error amounts to a constitutional deprivation, the court must view the totality of the circumstances." *Gall v. Parker,* 231 F.3d 265, 311 (6th Cir. 2000). The Supreme Court case law on habeas relief in the context of prosecutorial misconduct is extremely limited, *see, e.g., Smith,* 455 U.S. at 218-19.

### A.    Missing Witness

Plaintiff claims that the prosecutor improperly commented on the absence of Petitioner's stepfather, Clifford Spalding, as a witness. In closing arguments, the prosecutor stated: "we did not hear from anyone else to corroborate what [Ms. Spalding] had to say," (Tr. II, 85.) On rebuttal, the prosecutor also commented: "where is this Cliff Spalding to confirm Mike Leatherman came out laughing. I did not hear it from them . . . ." (Tr. II, 106.) When the prosecutor objected to Mr. Spalding as a defense witness because of discovery rule violations, defense counsel agreed not to call him as a witness. (Tr. I, 122; Tr. II, 30-31.)

In rejecting Petitioner's claim of prosecutorial misconduct on appeal, the Michigan Court of Appeals addressed the arguments as follows:

> Defendant next argues that numerous instances of prosecutorial misconduct deprived him of a fair trial. Specifically, defendant argues that some of the prosecutor's comments during closing argument and rebuttal closing argument were improper. The prosecutor's comments regarding the fact that defendant's stepfather did not testify were not improper because, contrary to defendant's argument, they did not mislead the jury. Moreover, to the extent that the comments suggested that the testimony of defendant's mother was not credible and should not be believed, they were proper because a prosecutor is permitted to argue from the facts that a witness is not worthy of belief. *People v. Launsburry,* 217 Mich App 358, 361; 551 NW2d 460 (1996).

MCOA Op., p. 3.

Petitioner has not clearly explained how the prosecutor's comment regarding Mr. Spalding's failure to testify implicated his constitutional rights. A defendant in a criminal case has

a constitutional right against compelled self-incrimination. U.S. CONST., AMEND. V. To effectuate this right, a prosecutor may not make any reference to or comment upon a defendant's failure to testify. *See Griffin v. California,* 380 U.S. 609 (1965). Petitioner did not testify at trial. In cases where a petitioner has exercised his Fifth Amendment right not to testify, the government must exercise care in commenting on a petitioner's failure to produce witnesses, so as not to violate the rule of *Griffin,* 380 U.S. 609, by calling attention to petitioner's own failure to testify. The Sixth Circuit has found that some statements do not constitute prosecutorial misconduct. A prosecutor's comment at closing that, "[e]verybody available testified," was not an improper comment regarding the petitioner's failure to testify because the comment was ambiguous and the jury would not necessarily infer petitioner's guilt from the comment. *Martin v. Mitchell,* 280 F.3d 594, 618-19 (6th Cir. 2002). Likewise, the prosecutor's comments regarding Mr. Spalding's failure to testify would not necessarily infer Petitioner's guilt. Further, the prosecutor did not ask the jury to infer that Mr. Spalding would have given testimony adverse to the defense. On the facts of the instant case, the state court's determination that the prosecutor's statements did not deny Petitioner's due process rights was not an unreasonable application of established Supreme Court authority.

### B.      Disparaging Defense Counsel

Petitioner also argues that the prosecutor committed prosecutorial misconduct by disparaging the defense in closing arguments. The prosecutor allegedly discredited defense counsel's arguments in closing statements by stating on rebuttal:

> I have empaneled a couple of these cases over the years and you think you have heard every argument, and then you hear an argument, a doctor in our community lies, lies, the Dr. Miller lied because she did not have corroborating evidence, and the defendant's lawyer says he does not think or he does not believe you have enough evidence.

> Well, who does he work for?  You, folks, work for justice, you folks took an oath to render a true and just verdict based upon the evidence, not what he thinks and not what I think, what you think.

(Tr. II, 102.)

In rejecting Petitioner's claims of prosecutorial misconduct on appeal, the Michigan Court of Appeals stated:

> The prosecutor's statement regarding defense counsel's suggestion that a prosecution witness lied to bolster or corroborate the victim's testimony was not improper because a prosecutor may properly respond to the innuendos of defense counsel that his witness is fabricating testimony.  *People v Sharbnow,* 174 Mich App 94, 101; 435 NW2d 772 (1989).  In addition, the prosecutor's statement asking who defense counsel worked for was not misleading because it pointed out a true fact: that defense counsel was acting as an advocate for defendant.  Furthermore, reading the prosecutor's remark about rendering "a true and just verdict" in context, the prosecutor properly urged the jury to make its decision based on the evidence.

MCOA Op., p. 3.

First, the prosecutor's statements in response to defense counsel's assertion that a witness lied were not improper.  "We begin, and end, our analysis of [Petitioner's] prosecutorial misconduct claim by considering whether the prosecutor's closing argument was improper. In determining whether it was improper, we 'view the conduct at issue within the context of the  trial as a whole.'"  *United States v. Barnett,* 398 F.3d 516, 522 (6th Cir. 2005)(citations omitted). When a court reviews the conduct at issue, "'[i]t is also appropriate to consider whether, and to what extent, a prosecutor's improper argument is invited by defense counsel's statements.'"  *Id.*   Although attorneys may not make "unfounded and inflammatory attacks on the opposing advocate," *United States v. Young,* 470 U.S. 1, 9 (1985), the contested remarks regarding Dr. Miller's testimony were merely responses to defense counsel's insinuation that Dr. Miller lied in her testimony.   The prosecutor was entitled to respond to defense counsel's arguments in his rebuttal.  *Angel v.*

- 24 -

*Overberg,* 682 F.2d 605, 607-08 (6th Cir. 1982); *see also Young*, 470 U.S. at 11-12 (stating that, in determining whether prosecutorial misconduct affected the fairness of the trial, a court must consider whether defense counsel invited the misconduct).

The remarks by the prosecutor regarding who the defense works for and the role of the jury also do not rise to prosecutorial misconduct. As stated in the Michigan Court of Appeals opinion, those comments point to true facts in a criminal case. The defense counsel advocates for the defendant. Also, the role of the jury is to reach a decision based on the evidence. Moreover, in its charge, the trial court instructed the jury that the statements and arguments by counsel were not evidence. (Tr. II, 115, 143-48.) Therefore, I conclude that the prosecutorial remarks were not improper.

### C.     Appeal to Jury's Sympathy for Victim

Petitioner also contends that the prosecutor engaged in misconduct by improperly appealing to the jury's sympathy during closing arguments. The following remarks are in issue:

> About 21 years ago the United States Supreme Court in a case that does not really make a whole lot of difference, they talked about a murder victim and a rape victim and the Judge said, the Justice said, you know, at least for a murder victim their life is over, they don't have the hell to live with every day. In other words, a rape victim every breath they take, every time they swallow, every time they close their eyes they have to live with being violated.

> Ladies and Gentlemen, 21 years later, that is what they were talking about and it [is] as real today as it was 21 years ago. I don't ask and you guys can't do it, you cannot erase her nightmares, you cannot erase the memories, but what you can do is go in the room and say, Ruth, we believe you, we don't believe that you opened your door up to a complete stranger and said, come on, let's have sex in my bathroom on the floor, we believe that you were violently raped, that he stuck his penis in her vagina and anus and we are not going to tolerate it and we are going to say to you, Mr. Prater, you are guilty and you are guilty of every single count and I ask that you do that.

(Tr. II, 87-88.)

The Michigan Court of Appeals addressed the claims as follows:

Defendant's contention that the prosecutor's comments comparing a murder victim and a rape victim were improper is also without merit. Contrary to defendant's contention, the comments did not appeal to the jury to sympathize with the victim. *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001). Rather, the comments were based on the victim's testimony and concerned the impact of the crime on the victim. It is permissible for a prosecutor to comment on the evidence and draw all reasonable inferences therefrom. *People v Kris Aldrich*, 246 Mich App 101, 112; 631 NW2d 67 (2001). Moreover, a prosecutor need not confine his argument to the blandest of all possible terms. *Id.* The trial court specifically instructed the jury that its decision must be based on the evidence and that sympathy must not influence its decision. Under these circumstances, the prosecutor's comments were not improper.

Defendant's contention that the prosecutor's comment that the jury could say to the victim, "we believe you," also was not improper. A prosecutor may argue that a witness should be believed. *People v Wise,* 134 Mich App 82, 104; 351 NW2d 255 (1984).

MCOA Op., p. 3.

The prosecutor's comments regarding comparing a murder victim with a rape victim, and appealing to the jury to believe the victim, were not so inflammatory as to constitute a denial of Petitioner's right to due process.  The Sixth Circuit has found prejudicial misconduct in cases that have involved much more egregious and pervasive attempts to evoke sympathy.  For example, in *United States v. Payne*, 2 F.3d 706, 711-15 (6th Cir. 1993), the Court of Appeals reversed a federal conviction because of the prosecutor's repeated references to Christmas time (the trial was a week before Christmas), poor pregnant women, and employee layoffs, finding that the prosecutor's statements were part of a calculated effort to evoke strong sympathetic emotions for the victims and against the defendants.  Similarly, in *Martin v. Parker*, 11 F.3d 613 (6th Cir. 1993), the Court of Appeals condemned the prosecutor's repeated references to the defendant as a "Hitler," a "dictator," a "disturbed individual," and "one of the most obnoxious witnesses you'll ever hear."  *Martin*,

11 F.3d at 616; *accord United States v. Steinkoetter*, 633 F.2d 719, 720-21 (6th Cir. 1980) (prosecutor's comparison of defendant to Pontius Pilate and Judas Iscariot required reversal).  By contrast, the prosecutor's remarks in the present case were not inflammatory, failed to mention Petitioner (other than to ask for a guilty verdict), and did not infect the trial with unfairness as to make the resulting conviction a denial of Petitioner's due process rights.  Finally, as the Sixth Circuit has observed, it is impossible to expect that a criminal trial will be conducted without some showing of feeling.  "'[T]he stakes are high, and the participants are inevitably charged with emotion.'" *Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir. 1990) (quoting *United States v. Wexler*, 79 F.2d 526, 529-30 (2d Cir. 1935)).  Given the nature of the crime, the prosecutor's comments were not improper.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date:  May 3, 2006                              __/s/ Ellen S. Carmody_____
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).